**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RAYMOND C. WINSTON, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 2:05-CV-0497-RDP** |
| | ) | |
| **JEFFERSON COUNTY, ALABAMA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION
ON CLASS CERTIFICATION**

**I.   Procedural History**

Pending before the court is Plaintiffs' Motion for Class Certification (Doc. #50) filed on February 17, 2006.  The court held a hearing on Plaintiffs' motion on April 25, 2006, in courtroom 7A.

Plaintiffs Raymond C. Winston and Claude H. Estes, III filed this action on March 9, 2005, against Jefferson County, Alabama, its Tax Collector, Treasurer and others.  Defendants moved to dismiss the claims in the original complaint asserting the court lacked jurisdiction, the Plaintiffs in the original complaint lacked standing, and based on notions of comity and other matters.  On September 20, 2005, this court denied Defendants' motions to dismiss without prejudice.  Since that time, the court has permitted Plaintiffs on three occasions to amend and restate their complaint.  Among other things, these amendments resulted in the addition of Mark Seay as a party plaintiff.

On August 1, 2005, this court entered an order scheduling discovery and other matters on the issue of class certification.  Following the court's order, Plaintiffs propounded interrogatories,

requests for admission, requests for production and also took depositions of certain of Defendants' representatives.

On February 17, 2006, Plaintiffs filed their Motion for Class Certification, together with an extensive evidentiary submission and memorandum brief.  Due to the constitutionality challenges of Plaintiffs' claim, the Attorney General for the State of Alabama was given appropriate notice and entered his waiver of any further participation on February 23, 2006.

Defendants filed no objection or challenge to Plaintiffs' Motion for Class Certification and the court conducted a hearing on that motion on April 25, 2006.  In open court, counsel for Defendants offered no opposition to Plaintiffs' Motion for Class Certification and the court thereafter undertook its own determination of the merits and support of  Plaintiffs' motion.

## II.    Factual and Statutory Overview[1]

The Jefferson County Tax Collector conducts yearly sales of real estate in Jefferson County, Alabama, to satisfy past due ad valorem taxes owed by the property owners.  The process resulting in these tax sales is regulated by state statute and, by virtue of that fact, is conducted in an extremely uniform and consistent fashion.  These tax sales are generally held in May following the year for

---

[1]The court has taken into account the well settled principle of law that while the court may look beyond the allegations of the complaint in determining whether a class should be certified, an assessment of Plaintiffs' likelihood of success on the merits is inappropriate. *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722 (11th Cir. 1987).  Moreover, by agreement of the parties, the facts referenced by the court in this Memorandum Opinion are the facts alleged by Plaintiffs and not disputed by Defendants for purposes of this motion only.  They may or may not be the "real" facts. These facts are recited for the limited purpose of providing background information related to the court's analysis of Plaintiffs' contentions related to their uncontested class certification motion. They are not otherwise binding on the parties, and although Defendants have opted not to challenge these facts for purposes of class certification, they may choose to challenge any of these facts when this case is litigated on the merits.

which the taxes were due.  For instance, the most recent sale conducted in May of 2006 pertained to past due taxes for tax year 2005.  The express purpose of these sales and the statutes that authorize them is to collect the outstanding taxes owed by the owners, together with any interest, penalties and costs.  In fact, the Tax Collector is directed by statute to sell only so much land as may be absolutely necessary to pay the taxes, attendant costs and interest which are owed by the owners.  *See* Alabama Code § 40-10-16.  None of these tax collection processes is challenged by the suit before this court.  However, in addition to collecting taxes, the Tax Collector has for many years also accepted funds in excess of the taxes due at these sales.  These excess funds are then retained by the County Treasurer.  While the taxpayer does receive prior notice of the tax sale, that notice does not mention that excesses may be accepted.  When the taxpayer discovers that excess funds have been produced on the sale, they are not allowed to receive the excess without first redeeming the property. According to Defendants' contention, in order to redeem after the sale, the taxpayer must also pay interest at 12% on the excess funds.

This trend started in the mid 1990's and has increased in volume each year.  Gary Boyd is the Director of Land Divestment in the Tax Collector's office and the County employee who handles the tax sales and redemptions on behalf of the Tax Collector.  According to Boyd, in May of 2005, the County sold 3,500 properties at the tax sale and 2,500 of those were sold to investors producing excess funds.  On those 2,500 properties, the Tax Collector collected approximately 30 million dollars in excess funds over and above what was due on the taxes.  It is undisputed that any excess money received at the sale is not paid to the taxpayer and is placed in the County Treasury.

Plaintiffs bring this class-wide challenge on behalf of the persons who had their property sold within the past 13 years under such sales which produced excess funds.

3

## THE TAX SALE PROCESS

Mr. Gary Boyd is Director of Land Divestment in the Jefferson County Tax Collector's Office.  He conducts the yearly tax sales, handles the excess funds, and deals with redemption procedures following the tax sale.  Mr. Boyd testified that the Alabama statutes are his guide for the procedures used and that they are applied uniformly to all taxpayers with no difference in the approach on different properties within Jefferson County.  Similarly, the redemption procedures used when a taxpayer redeems property following a tax sale are also uniformly applied.  As a result, Boyd agreed that the Plaintiffs' transaction was handled in the same manner as other similar transactions would have been handled and that his treatment of Plaintiffs was typical of the way he treated other similarly situated taxpayers.

Ad valorem tax collection begins each year with a regular notice being sent to the owner of the assessed property.  Typically these notices go out shortly after October 1 to inform the taxpayer of the assessed valuation of the property, the tax due and that payment should be made no later than December 31.  The notice is based on an assessment of market value of the property about which the owner was also given notice and opportunity to object.  If, for whatever reason, the taxpayer fails to pay the ad valorem taxes by December 31, the Tax Collector sends a delinquency notice giving them until February 15 to pay the outstanding taxes, a collector's fee and interest due until that date.  If there is no payment, then the Tax Collector petitions the Probate Court to sell the property which enters a series of orders, all specified by statute.   The result of these orders is to set a hearing before the Probate Court to determine whether or not the property should be sold.  The taxpayer is also sent a "citation notice" of  this hearing.  If no further action is taken by the taxpayer, the Probate Court will enter a decree of sale directing the Tax Collector to sell the property "for the payment of the

4

amount of taxes" and for fees and costs.  Additional notice is also provided to the taxpayer by virtue of publication in the newspaper.  Once the decree of sale is entered, the Tax Collector then conducts the sale.  Each of these notices and procedures is uniform in an attempt to comply with the statutory requirements.   Nothing in any aspect of the notices, decrees, citations or publications mentions that the Tax Collector will solicit or accept excess funds over and above the taxes due, or that such excess funds would bear interest at 12% per annum.   The Citation Notice and publication notice state that the property will be sold to the highest bidder.

At the point of the tax sale each May, the Tax Collector receives the bids on the properties, collects the money and then provides to the purchaser a "certificate of purchase."  This is not a deed to the property, but can ripen into a tax deed at the end of three years unless the property is redeemed in the intervening time.

In May 2005 alone, the Jefferson County Tax Collector sold approximately 3,500 properties affecting thousands of individuals.  Of that number, Boyd estimates approximately 2,500 were sold to private purchasers.  The remaining 1,000 properties were sold to the State, because no one bid for the properties.  Of the 2,500 sold to private purchasers, approximately 30 million dollars was collected in excess over what was owed for taxes, interest and costs.   The properties which are bid in by the State are sold for only the actual amount of the taxes and costs due, with no excess being shown on those properties.  Excess funds over the taxes due only become involved if a private investor comes to the tax sale and bids for the property at an amount in excess of the taxes owed. The land is offered at auction allowing the bidders to bid up the price of the tax deed by offering excesses over and above the taxes actually due.

There is consistency in the policy and practice in accepting excess funds.  The Tax Collector provides no prior notice to the taxpayer that:

(1)     excess funds may be accepted at the sale for amounts over and above the tax and costs due; or

(2)     in order to redeem his property, the taxpayer will be required to pay 12% interest on any excess funds paid at the tax sale in addition to the tax, penalties, costs and interest on tax itself; or

(3)     that any excess funds paid at the sale of their property are available; or

(4)     that any excess funds paid will be held by in the County Treasury at interest;

At the date of the tax sale, the Jefferson County Tax Collector takes the money from each tax sale and then pays it over to the County Treasurer who maintains a segregated interest bearing accounting for the excess funds received.

## THE EXCESS FUNDS STATUTE

Alabama Code § 40-10-28 provides:

The excess arising from the sale of any real estate remaining after paying the amount of the decree of sale, and costs and expenses subsequently accruing, shall be paid over to the owner, or his agent, or to the person legally representing such owner, or into the county treasury, and it may be paid therefrom to such owner, or into the county treasury, and it may be paid therefrom to such owner, agent or representative in the same manner as to the excess arising from the sale of personal property sold for taxes is paid. If such excess is not called for within three years after such sale by the person entitled to receive the same, upon the order of the county commission stating the case or cases in which such excess was paid, together with a description of the lands sold, when sold and the amount of such excess, the county treasurer shall place such excess of money to the credit of the general fund of the county and make a record on his books of the same, and such money shall thereafter be treated as part of the general fund of the county. At any time within 10 years after such excess has been passed to the credit of the general fund of the county, the county commission may on proof made by any person that he is the rightful owner of such excess of money order the payment thereof to such owner, his heir or legal representative, but if not so ordered and paid within such time, the same shall become the property of the county.

6

(the "Excess Funds Statute").

Defendants interpret and apply the Excess Funds Statute so that the County, after conducting a tax sale, retains in the County Treasury all excess funds. The excess funds are not paid to the owner of the property at the time of the sale nor are those funds made available to the owner at any point by Defendants unless the owner redeems the property. If the owner redeems his or her property, the Tax Collector does not pay the owner the interest the County has earned on the excess funds while those funds were retained in the County Treasury.

## REDEMPTION

Once the land is sold for taxes by the Tax Collector, statutes provide a framework for redemption by the taxpayer for up to three years following the tax sale. Alabama Code § 40-10-120. Redemption within three years following the tax sale requires the taxpayer to pay the Tax Collector "the amount of money for which the lands were sold" plus 12% interest thereon and all taxes due since the sale with 12% interest and all costs and fees. Alabama Code § 40-10-121. The redeeming taxpayer is given no credit toward this payment for the interest the County has earned on the excess funds while the funds were in the County's possession. Instead, on redemption, the County Tax Collector collects these sums and then remits them to over to the investor/purchaser at the tax sale who receives the benefit of this interest on the excess funds.

## REDEMPTION AFTER TAX DEED

After three years following the tax sale, the purchaser at the tax sale is entitled to a tax deed. Alabama Code § 40-10-29. Redemption after the issuance of a tax deed to the purchaser is also protected so long as the taxpayer has remained in possession. Alabama Code § 40-10-83; *McGuire v. Rogers,* 794 So.2d 1131 (Ala. Civ. App. 2000)*; Daugherty v. Restor*, 645 So. 2d 1361 (Ala. 1994).

7

If the owner desires to redeem his or her property *after three years* and the issuance of the Tax Deed, he or she is first required to acquire the interest of the holder of the Tax Deed. This requires the taxpayer to first pay that purchaser the excess funds and interest thereon at 12% (in addition to all taxes paid, penalties costs and interest thereon at 12%). If the taxpayer can buy that interest, he will typically be given a quitclaim deed. Even with that quitclaim deed, Jefferson County Tax Collector will not release the excess funds it has been holding at interest until the redeeming party signs an affidavit and agreement to indemnify the County. Only then will the County Tax Collector direct the County Treasurer to pay the redeeming party the net excess funds it has been holding but with no interest thereon.

Without redemption, however, Defendants will not allow the owner to have the excess funds which were paid at the sale.

## PLAINTIFFS' ALLEGATIONS

### Winston and Estes

Plaintiffs Winston and Estes owned property which was sold by the Jefferson County Tax Collector on May 15, 2001. The purchaser at the tax sale of Plaintiffs' real estate paid $6,000.00 in Excess Funds over and above the taxes, penalties, interest and costs of $801.97 owed by Winston and Estes and thereafter had the property assessed in its name so that future tax notices were sent to the purchaser rather than Winston and Estes. The Excess Funds collected by the Tax Collector on the sale of Winston's and Estes' land were never paid to them and are still in the County Treasury earning interest. On August 18, 2004, a Tax Deed was issued to the purchaser of Winston's and Estes' property. In January 2005, Winston and Estes learned that their property had been sold for taxes and began efforts to redeem it. They were told by the Tax Collector's employees that a tax

deed had already been issued and that they must first acquire the interest of the Tax Deed holder before any distribution could be made of the excess funds that the County Treasurer was holding. To acquire the interest of the purchaser of the Tax Deed, Winston and Estes were required to pay $15,231.93 which included an excess payment of $6,000.00 and interest on that excess at 12%. Only then was a quitclaim deed issued to them which Winston then presented to the Tax Collector and asked again for the excess funds which had been held in the County Treasury. At that point, Winston was told that he must first sign an affidavit and agree to indemnify and hold harmless Jefferson County, the State of Alabama and all of their employees from any claim by anyone who claims to be an owner of the money. When Winston refused, the Tax Collector refused to approve the payment to him of the excess funds. Winston has still not received the excess funds from the sale of his land.

**Mark Seay**

Plaintiff Mark Seay was the owner of real estate in Jefferson County which was sold for past due ad valorem taxes in May 2004. The purchaser at the tax sale of Seay's real estate paid $23,500.00 in excess funds over and above the taxes, interest, penalties and costs of $2,520.66 owed by Seay and thereafter had the property assessed in its name so that future tax notices were sent to the purchaser rather than to Seay. Seay has not redeemed his property which was sold in May of 2004 and the excess funds received by the Tax Collector for Jefferson County on the sale of his land have never been paid to him and are still in the County Treasury earning interest.

### III.   Analysis

### Class Definition

The parties have jointly proposed certification of the following defined class:

All individuals or entities who, at some time within the 13 years before the filing of this action or since that time, owned property in Jefferson County, Alabama, which was sold to pay delinquent property ad valorem taxes owed by such owners and which sale produced an excess over the taxes, interest, penalties and costs due.

This class shall not include claims based upon tax sales for the years between 1994 and 1998 by persons or entities who participated as members of the settlement class in *Maples v. Williams,* and who redeemed the property sold to investors, other than the State of Alabama, and were required to pay at redemption 12% interest on an "overbid" amount.

**Class Claims**

Plaintiffs' claims are all under Title 42 U.S.C. § 1983 and seek injunctive and declaratory relief.  Those claims seek to:

1.    Declare that the Excess Funds Statute found in § 40-10-28 is void as unconstitutional;

2.    Award to Plaintiffs and Class Members damages under 42 U.S.C. § 1983 equal to the excess funds held by the County, plus statutory interest thereon, costs, and attorneys' fees;

3.    Issue a permanent injunction enjoining Defendants from interpreting and/or applying the Excess Funds Statute in a manner to allow the acceptance of excess funds at tax sales;

4.    Enjoin Defendants from interpreting or applying the Excess Funds Statute or any attendant statutes as requiring redeeming property owners to pay interest on excess funds held by the County as a condition of redemption; and

5.    Enjoin Defendants from interpreting or applying the Excess Funds Statute or any attendant statutes as requiring redeeming property owners to indemnify them as a condition of redemption.

In addition, and as part of the equitable relief sought, Plaintiffs ask that the excess funds being held by Defendants be distributed to the owners whose property was sold generating this

10

excess.  The court finds that though monetary, this relief is in the form of an equitable restitution to make the Class Members whole and will not require individualized and subjective damage claims. If the threshold class requirements under Rule 23(a) are met, this case presents the "paradigmatic" and "classic" case for class certification under Rule 23(b)(2).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

**Rule 23(a) Threshold Requirements**

For purposes of class certification, substantive allegations in the complaint are accepted as true.  *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1033 (N.D. Miss. 1993).  The issue at the certification stage is not whether Plaintiffs will prevail on the merits, but whether the requirements of Rule 23 are met.  *Miller  v. Mackey International, Inc.*, 452 F.2d 424, 427 (5th Cir. 1971).

Cases such as this are especially suited for class treatment.  Plaintiffs have specifically limited their claims to include only challenges to practices which overtly take property and have refined the class definition to include only those property owners who were harmed by those practices.  None of the relief sought requires an inquiry into the individual circumstances of the Class Members.  Therefore, the court finds certification is appropriate under both Rule 23(b)(2) and (b)(3).

1.      **Plaintiffs Have Standing.**

To establish standing, a plaintiff must have sustained an injury-in-fact that would be corrected by a decision in his or her favor.  *Church v. City of Huntsville*, 30 F.3d 1332, 1335 (11th Cir. 1994); *see Pettco Enterprises, Inc. v. White*, 162 F.R.D.151, 156 (M.D. Ala. 1995) ("The core of the standing doctrine is a requirement that a plaintiff allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.").

Plaintiffs satisfy the standing requirement.  Defendants sold Plaintiffs' property at auction and collected excess funds from the purchaser of their property and kept the money.  Plaintiffs were not allowed to have the excess funds resulting from the sale of their property.  Even if they were to attempt to redeem their property following the sale, they would be forced to pay, in addition to the taxes, interest on the tax, costs and penalties, and interest at a rate of 12% per annum on the excess funds as well.  By way of example, when Plaintiff Raymond Winston redeemed his property, he was required to pay all the back taxes, interest on the taxes, costs and penalties and interest at 12% on the excess funds as well, but was not given the excess funds being held by Defendants because he refused to agree to indemnify the County and State.  Mark Seay had his property sold at auction and $23,500.00 in excess funds was accepted and retained in the County Treasury.

### 2.    Rule 23(a) Is Satisfied.

Rule 23(a) contains four threshold requirements for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  As outlined below, Plaintiffs satisfy each of the Rule 23(a) requirements.

#### i.    Numerosity

Under Rule 23(a)(1), a class action may be maintained only if the class is so numerous that joinder of all Class Members is impracticable.  *Dujanovic v. Mortgage America, Inc.*, 185 F.R.D. 660, 666 (N.D. Ala. 1999); *Terazosin Hydrochloride Antitrust Litig.*, 203 F.R.D. 551, 553 (S.D. Fla. 2001).  Whether joinder is practicable depends on many factors including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion.  *See Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (class of at least 31 individual class members from a wide geographic area met the

numerosity requirement).  If the court can draw reasonable inferences from the facts before it as the approximate size of the class and the infeasibility of joinder, the numerosity requirement is satisfied. *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) ("Although mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class.  Furthermore, the relevance of the numerosity requirement to class certification may in appropriate cases be less significant where in fact class wide discrimination has been alleged . . . "); *Dujanovic*, 185 F.R.D. at 666 ("this court may 'make common sense assumptions' to support a finding of numerosity").

Here, the size of the putative class  makes joinder impracticable. Jefferson County Tax Collector's records establish that at least several thousand Jefferson County property owners have had their property sold at auction and an excess bid made on these properties during the proposed Class Period, 1992-2005.  (Plaintiffs' Exhibit A, p. 40).  Because the proposed Class is so large, numerosity is satisfied.  *See, e.g., Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (explaining that "while there is no fixed numerosity rule, 'generally less than twenty-one is inadequate, more than forty adequate . . . '").[2]

### ii.    Commonality

Commonality requires that the grievances of Plaintiffs and the Class Members share a common question of law or of fact.  Fed. R. Civ. P. 23(a)(2).  The commonality element has been

---

[2]*See also Terazosin*, 203 F.R.D. at 553 ("finding that a class of over one thousand satisfied the numerosity prerequisite); *In re Consolidated "Non-Filing Insurance" Fee Litig.*, 195 F.R.D. 684, 693 (M.D. Ala. 2000) (finding that a class of thousands of policyholders satisfied the numerosity prerequisite); *Kreuzfield A.G. v. Carnehammar*, 138 F.R.D. 594, 599 (S.D. Fla. 1991) (finding that a class of 130 satisfied the numerosity prerequisite).

construed by one court as only requiring that there be one issue that affects all or a significant number of proposed Class Members. *Anderson v. Garner*, 22 F. Supp. 2d 1379, 1385 (N.D. Ga. 1997) (a common question is defined as "one which arises from a 'nucleus of operative facts,' regardless of whether the underlying facts fluctuate over a class period and vary as to individual claimants.").[3] Indeed, the Supreme Court has stated that a "single plaintiff can use the discrimination he or she has suffered as a basis for a company-wide class action if that discrimination stems from an identifiable corporate policy that affects all." *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 159 n.15 (1982).

Plaintiffs charge that Defendants have a common policy and practice of accepting and retaining the excess funds which are acquired on the sale of Class Members' property. The commonality affecting this Class is shown by the following facts that are unchallenged for purposes of this motion:

- Defendants maintain a practice or common course of conduct of withholding excess funds from all landowners that failed to redeem their property after tax sales;

- Defendants require landowners that had their property sold at tax sales to pay interest on the excess funds paid for their property if the owner redeems the property;

- Defendants do not refund the excess funds to the original property owner if the property is not redeemed;

- Defendants require indemnification agreements to be executed prior to allowing a redeeming landowner to receive any excess funds; and

---

[3]*See also Dujanovic*, 185 F.R.D. at 667 (commonality can be found where the class allegations arise from "a common nucleus of operative facts"); *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993); *Cox*, 784 F.2d at 1567 (The commonality element is satisfied whenever "[t]he claims actually litigated in the suit [are] fairly represented by the named plaintiffs.").

- These practices of Defendants are continuing.

Common questions of law raised by Plaintiffs' Fourth Amended Complaint include, but are not limited to, the following:

a.  Whether Defendants' procedure for handling excess funds received on tax sales violates the equal protection clause of the Fourteenth Amendment to the United States Constitution or deprives Plaintiffs and the Class of property without due process;

b.  Whether the failure by Defendants' to notify owners of their right to receive the excess funds collected at the tax sale of their property violates due process;

c.  Whether the refusal of Defendants' to allow owners to receive excess funds paid at the sale of their property without redeeming the property violates due process;

d.  Whether Defendants retention and investment at interest of excess funds received at tax sales violates due process;

e.  Whether Defendants' refusal to remit interest on the excess funds which are held at interest to the owners of those funds violates due process; and

f.  Whether the practice and statutory scheme of accepting excess funds on tax sales which thereafter bear interest at the same 12% rate as delinquent taxes violates due process and equal protection.

The fundamental issues raised in this lawsuit focus on a statute and Defendants' policies and practices related thereto, all of which affect all Jefferson County landowners that have had their property sold at auction for sums in excess of the unpaid taxes due.  Because this system is uniform in its application, it provides an underlying pattern of common allegedly unlawful behavior. Thus, the commonality requirement is satisfied.

15

### iii.    Typicality

The typicality requirement is met when each class member's claim arises "from the same event or pattern or practice and are based on the same legal theory" as the claims of the class. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984).  Here, the typicality requirement is easily satisfied.[4]  Plaintiffs make the same legal argument that all Class Members will make.  Plaintiffs are or were Jefferson County property owners that had their property sold at a tax sale for sums in excess of what was then due.  These excess funds were either never paid to Plaintiffs or paid upon the condition that Plaintiffs pay interest on the excess funds and sign indemnity agreements.  Because Defendants' practices adversely affected Plaintiffs and the other proposed Class Members "in the same general fashion," their claims are indeed typical of the claims of the entire Class.  *Kornberg*, 741 F.2d at 1337; *see Dujanovic*, 185 F.R.D. at 660 (finding that typicality prerequisite is satisfied when plaintiff alleges harm that is caused by defendant's policies and practices); *Ingram*, 200 F.R.D. at 698 (finding typicality when plaintiffs alleged a harm caused by defendant's company-wide policies and practices); *Terazosin*, 203 F.R.D. at 554 (finding typicality when defendants are alleged to have engaged in a pattern or practice of unlawful acts).

### iv.    Adequacy of Representation

The final Rule 23(a) certification prerequisite is adequacy of representation.  To meet this requirement, Plaintiffs must show:  (1) that Plaintiffs' counsel is competent to handle the case; and

---

[4]As noted by many courts, the commonality and typicality requirements involve similar considerations and "tend to merge." *Falcon*, 457 U.S. at 158 n.13.  Both requirements "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the Class Members will be fairly and adequately protected in their absence." *Id*. Typicality is thus satisfied here for substantially the same reasons that the commonality requirement is satisfied.

(2) that there are no disabling conflicts of interest among the Class Members.  *Griffin v. Carlin*, 755 F.2d 1516, 1532-33 (11th Cir. 1985); *"Non-Filing Insurance" Fee*, 195 F.R.D. at 691.  Both requirements are met here.

Plaintiffs' counsel are experienced class action attorneys who have successfully litigated major consumer class actions against numerous banks, financial institutions, and others.  (*See* Plaintiffs' Exhibits M, N, O (Affidavits of Evans, Gentle and Rosenthal)).  There is no reason to believe that Plaintiffs' counsel will not prosecute this case with their usual high degree of diligence and vigor.

Second, there are no conflicts among the proposed Class Members that undermine adequate representation.  As property owners, all Class Members share the same interest and their claims are, essentially, identical.  The adequacy of the representation requirement of Rule 23(a)(4) therefore is satisfied.

### Rule 23(b) Requirements

**1.      Certification is Warranted Under Rule 23(b)(2).**

Having addressed the Rule 23(a) requirements for certification, the court will now review the specific bases for certification in this matter.  Rule 23(b)(2) contains two basic requirements: (1) the class members must have been harmed in essentially the same way by the Defendant's acts; and (2) the common injury may properly be addressed by class-wide injunctive or equitable remedies. *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983)("[T]he claims contemplated in a (b)(2) action are *class* claims, claims resting on the same grounds and applying more or less equally to all members of the class.") (emphasis in original).  Where these requirements are met, the class members' interests are sufficiently cohesive that absent members will be adequately

17

represented. *Holmes*, 706 F.2d at 1155 n.8 ("[T]he (b)(2) class is distinguished from the (b)(3) class by class cohesiveness . . . [i]njuries remedied through (b)(2) actions are really group, as opposed to individual injuries."); *see Lemon v. International Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000) ("Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on the adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members."). Rule 23(b)(2)'s requirements are met here.

This action seeks to enjoin what Plaintiffs allege to be years of an illegal taking by Defendants and to declare the same unconstitutional. This is exactly the type of case for which Rule 23(b)(2) was designed. Defendants have established and carried out a uniform practice concerning landowners that have had their property sold at auction for an excess bid. Certification under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Defendants' conduct is directed against a specific class of people and is uniform in its application. This case thus falls squarely within the ambit of Rule 23(b)(2).

### i.    Class Members Have Been Harmed in the Same Way.

Cohesiveness exists in this case because all Class Members have been affected in the same way by Jefferson County's systematic and uniform practices concerning the interpretation and application of the Excess Funds Statute. The statute involved and the challenged policies and practices are uniformly directed toward all landowners who have had their property sold at auction and an excess bid paid.

ii.       **Plaintiffs Seek Class-Wide Injunctive Relief and Equitable Remedies.**

Cohesiveness also exists because the injunctive and equitable "make whole" remedies sought

by Plaintiffs seek relief for the Class Members' common injury.  This requested relief includes:

- A permanent injunction enjoining Defendants from interpreting and/or applying the Excess Funds Statute in a manner to allow the acceptance of excess funds;

- A declaration that the Excess Funds Statute found in § 40-10-28 is void as unconstitutional;

- An injunction enjoining Defendants from interpreting or applying the Excess Funds Statute or any attendant statutes as requiring redeeming property owners to pay interest on excess funds held by the Treasurer as a condition of redemption;

- An injunction enjoining Defendants from interpreting or applying the Excess Funds Statute or any attendant statutes as requiring redeeming property owners to indemnify them as a condition of redemption; and

- Equitable relief in the form of an equitable accounting, a constructive trust, disgorgement and restitution of the retained excess funds with appropriate interest additions.

These forms of relief are appropriate for Rule 23(b)(2) certification.  Injunctive relief and declaratory

relief is the predominant remedy sought by Plaintiffs.

While an injunction forcing Defendants to end the current practices is Plaintiffs' predominant

request, other equitable relief may properly be sought under Rule 23(b)(2) without destroying the

cohesiveness of the Class.   Monetary relief is appropriate provided that the awards are either

equitable in nature or secondary to the general scheme of injunctive relief.  *Carnegie v. Mutual*

*Savings Life Ins. Co.,* No. Civ. A. CV-9953292 - NE, at * 15 2004 WL 3715446 (N.D. Ala. Nov.

23, 2004).   Moreover, this Circuit holds that equitable remedies in no way conflict with the

limitations of Rule 23(b)(2) when Defendants' liability for the equitable relief "is rooted in grounds

applicable to all members of the defined class." *Holmes*, 706 F.2d at 1155 (citing *Pettway v. American Cast Iron Pipe*, 494 F.2d 211 (5th Cir. 1974)). While the Eleventh Circuit in *Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001) denied (b)(2) certification of claims for substantive legal damages, such as emotional distress, which necessitated specific individualized determinations, that court also recognized that (b)(2) certification is warranted when group remedies flow directly from liability to the class as a whole. *Id*.

Here, Plaintiffs seek no individualized subjective damages like those that prohibited certification in *Murray*. Instead, they seek "make whole" equitable group remedies, similar to back pay, which flow directly from a finding of liability to the Class as a whole. Title 42 U.S.C. §1988(a) gives this court full power to fashion effective equitable remedies. *Jones v. Alfred H. Mayer*, 392 U.S. 409 (1968). The court certifies the above defined Class pursuant to Rule 23(b)(2).

### 2.      Certification Is Also Warranted Under Rule 23(b)(3).

A class may properly be certified under Rule 23(b)(3) if common questions of law or fact predominate and adjudication by class action is superior to other available methods. Fed. R. Civ. P. 23(b)(3). Here, both requirements are readily met.

Subdivisions (b)(3) and (b)(2) both require the existence of common questions of law or fact. However, (b)(3) contains the more stringent requirement that common issues must "predominate" over individual issues. Also, it adds "superiority" to Rule 23's list of qualifications for certification.

> In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' . . . Sensitive to the competing tugs of individual autonomy for those who might prefer to go it alone or in a smaller unit, on the one hand, and systemic efficiency on the other, the Report for the 1966 amendments cautioned:

'The new provision invites a close look at the case before it is accepted as a class action . . .'

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citations omitted).

Rule 23(a)(2) "does *not* require that *all* . . . questions of law and fact raised by the dispute be common." *Cox v. American Case Iron Pipe Co.*, 784 F.2d at 1557 (emphasis supplied).  Rather, the test for commonality "is qualitative rather than quantitative – that is, there need be only a single issue common to all members of the class."  *Newberg, supra*, § 3.10, at 3-50.  Further, the rule "requires only that resolution of the common questions affect all or a substantial number of the class members."  *Shipes v. Trinity Industries*, 987 F.2d 311, 316 (5th Cir. 1993).

### i.    Common Issues Predominate.

Predominance exists if the issues subject to general proof and thus applicable to the class as a whole predominate over those issues susceptible only to individualized proof.  *Nichols v. Mobile Board of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. Unit B 1982).  The common issues, however, need not be dispositive of the entire litigation.  Those questions peculiar to individual class members may remain after resolution of common issues does not preclude class certification.  *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1378-79 (11th Cir. 1984) (quoting *Dolgow v. Anderson*, 43 F.R.D. 472, 490 (E.D.N.Y. 1968)).  Rule 23(b)(3)'s predominance inquiry is designed to test "whether proposed classes are sufficiently *cohesive* to warrant adjudication by representation." *Amchem Products*, 521 U.S. at 623 & n.19 (emphasis supplied).  For example, Rule 23(b)(3)(A) instructs courts to consider "the interest of members of the class in individually controlling the prosecution . . . of separate actions."

Predominance exists here because proof of the common liability issues (*i.e.*, Defendants' policy of accepting and retaining excess funds) will, at the same time, prove that Defendants' actions affected every member of the Class.  Proof of each Class Members' claim against Defendants would not require the resolution of case-specific individualized issues.  Plaintiffs assert (and for purposes of this motion it is agreed) that Defendants treated all Class Members the same way it treated Plaintiffs – it charged them interest on the excess funds and/or kept the excess funds as their own. If Defendants' practice is found to be unconstitutional, it will be liable to all Class Members.

### ii.        A Class Action is the Superior Form of Prosecution.

The court finds that, in this case, "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  For a number of reasons, the overwhelming majority of Class Members have little incentive or ability to prosecute their claims against Defendants through individual actions.  Individuals face the task of pursuing a government entity as a defendant for relatively low value claims requiring significant resources to prove.  Such a combination would make the retention of legal representation all but impossible.  Nor could the Class Members of modest means be expected to take on a large governmental entity by themselves.  *See Sala v. National R.R. Passenger Corp.*, 120 F.R.D. 494, 500 (E. Pa. 1988); 7A Wright & Miller, *Federal Practice and Procedure*, § 1779 at 557 ("a group composed of consumers . . . typically will be unable to pursue their claims on an individual basis because the cost of doing so exceed any recovery they might secure").[5]

---

[5]*See also In re Copely Pharmaceutical Inc.*, 158 F.R.D. 485, 492 (D. Wyo. 1994) ("persuasive" case for certification made by attorney representing six plaintiffs with small claims who "argued that without class certification neither he nor his clients had the resources to have their day in court against a large defendant"); *In re Badger Mountain Irrigation Dist. Sec. Litig.*, 143 F.R.D. 693, 701 (W.D. Wash. 1992) (average individual claim of $15,000 too small to justify

Another superiority factor set forth on Rule 23(b)(3) is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." This is the logical forum to adjudicating Class Members' claims since the Defendant is the same county in which all property involved is located.

The manageability inquiry is not whether there will be any manageability problems at all, but whether reasonably foreseeable difficulties render some other method of adjudication superior to class certification. *In re Coordinated Proceedings in Antibiotic Antitrust Actions*, 333 F. Supp. 278, 287-83 (D.N.Y. 1971) (" . . . defendants, after reciting potential manageability problems, seem to conclude that no remedy is better than an imperfect one"); *see generally*, 1 Newberg § 4.3 at 4-125 ("It is only when such difficulties made a class action less fair and efficient than some other method, such as individual interactions or consolidation of individual lawsuits, that a class action is improper."). There exists a strong presumption against denying class certification for management reasons. *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 363 (S.D. Ga. 1996).

This case presents no significant manageability concerns. The Class as defined is easily and objectively ascertainable. More important, there are no individual issues on either liability, equitable remedies or damages issues. Finally, the funds alleged to be wrongfully taken are segregated on the County's records. Accordingly, certification is also appropriate under Rule 23(b)(3).

### Other Class Certification Considerations

1.     **Notice**

---

individual lawsuits); *Cumberland Farms, Inc. v. Browning-Ferris Indus.*, 120 F.R.D. 642, 648 (E.D. Pa. 1988) (class action superior as there were a large number of individuals injured, although no one person may have been damaged to degree which would have induced him to institute litigation on his own).

The court having certified the class in this matter pursuant to Rule 23(b)(2) nonetheless directs that the class members shall be given notice of this certification, the claims asserted, and also be given the right at an appropriate time to opt-out.  Some aspects of Plaintiffs' claims include restitution in the form of monetary relief.  Notice and opt-out rights protect the interests of those persons, if any, who might wish to pursue an individual claim for compensatory damages. Accordingly, the court hereby orders such a procedure under pursuant to Rule 23(c)(2)(a) and the plenary powers granted by Rule 23(d)(2) and 23(d)(5).  *See e.g., Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 418 n.13 (1998).  ("Indeed, we have long-required notice in (b)(2) class actions in which equitable monetary claims are at stake.").  The parameters and requirements of that notice, as well as Plaintiffs' obligations thereunder, are included in the separate order of the court regarding certification.

### 2.    Class Counsel

The court has considered the affidavits of Plaintiffs' counsel submitted with the Motion for Certification.  The court has further considered and observed the work done by these counsel in the prosecution of this action and has observed them in various hearings before the court.  From these facts, the court is satisfied that Plaintiffs' counsel possess sufficient experience in handling class actions, sufficient knowledge of the applicable law and have the resources necessary to represent the class.

### IV.    Conclusion

Accordingly, consistent with this Memorandum Opinion, the court will enter an order granting Plaintiffs' Motion for Class Certification.

**DONE** and **ORDERED** this _____26th_____ day of June, 2006.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE