# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **RAYMOND C. WINSTON, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:05-CV-0497-RDP** |
| | } | |
| **JEFFERSON COUNTY, ALABAMA,** | } | |
| **et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the court are several motions: (1) Proposed Intervenors MNP Holdings, Inc. and Ruth Evans' Motion to Intervene (Doc. # 94) filed on March 29, 2007; (2) Proposed Intervenor Geneva M. Geter's Motion to Intervene/Objection to *Winston* Class Settlement, or in the Alternative, Motion to Reconsider Denial of Motion to Consolidate Cases (Doc. # 96) filed on March 29, 2007; (3) Plaintiffs' Motion to Enforce Settlement (Doc. # 102) filed on April 3, 2007; (4) Plaintiffs' Motion to Strike Affidavit of J. T. Smallwood (Doc. # 103) filed on April 3, 2007; (5) Defendants' Renewed Motion to Dismiss (Doc. # 112) filed on April 10, 2007; and (6) Plaintiffs' Petition for Final Approval of Settlement and Award of Attorneys' Fees (Doc. # 113) filed on April 11, 2007.

Finding Defendants' Renewed Motion to Dismiss (Doc. # 112) dispositive of all outstanding motions in this case, the court renders a decision only on that motion, which has been fully briefed by all interested parties and is now ripe for decision by the court.  For the reasons outlined below, the court concludes that Defendants' motion to dismiss is due to be granted because (1) the Federal Tax Injunction Act, 28 U.S.C. § 1341 (2000) ("TIA"), divests this court of jurisdiction over

Plaintiffs' claims, and (2) alternatively, the principles of comity dictate that this court should decline

to exercise jurisdiction over this case.  Therefore, all other motions pending in this case will be

denied as moot, and all of Plaintiffs' claims against Defendants Jefferson County, Alabama, J. T.

Smallwood, Tax Collector of Jefferson County, Alabama, and Barry Stephenson, Treasurer of

Jefferson County, Alabama (collectively referred to herein as "Defendants") will be dismissed

without prejudice.

## II.   BACKGROUND

### A.   Statement of Relevant Facts

Plaintiffs, who have been previously approved as a class for settlement purposes in this case,[1]

argue that Defendants' interpretation of the Alabama Excess Fund Statute[2] deprived them of their

---

[1]The Members of the settlement Plaintiff Class include:

> All individuals or entities who at some time within the 13 years before the filing of this action, or since that time, owned property in Jefferson County, Alabama, which was sold to pay delinquent ad valorem taxes owed by such owners, and which sale produced an excess over the taxes, interest, penalties and costs due, and which excess is still held by Jefferson County.

> This class shall not include claims based upon tax sales for the years between 1994 and 1998 by persons or entities who participated as members of the settlement class in *Maples v. Williams* and who redeemed the property sold to investors other than the state of Alabama and were required to pay at redemption 12% interest on an overbid amount.

(Doc. # 61 ¶ 3).

[2]Alabama Code §40-10-28, entitled "Excess funds after sale," states:

> The excess arising from the sale of any real estate remaining after paying the amount of the decree of sale, and costs and expenses subsequently accruing, shall be paid over to the owner, or his agent, or to the person legally representing such owner, or into the county treasury, and it may be paid therefrom to such owner, or into the

2

constitutional right to due process and that such interpretation and application of the Excess Funds Statute worked an unconstitutional taking without compensation.

According to the complaint, Plaintiffs Winston and Estes' property in Jefferson County was sold in May 2001 to pay delinquent property or *ad valorem* taxes, and Plaintiff Seay's property in Jefferson County was sold in May 2004 for the same purpose. The properties were sold for sums in excess of the amount Plaintiffs owed in taxes ("excess funds" or an amount over the amount of delinquent taxes owed), which Defendants retained and placed in an interest-bearing account. When the Plaintiffs Winston and Estes later redeemed (bought-back) their property, they were required to pay their back property taxes, interest at 12% on those taxes, and interest at 12% on the excess funds. Defendants remitted the excess funds to the Plaintiffs, but retained for themselves the interest earned on the excess funds while in Defendants' possession without crediting this amount to Plaintiffs Winston and Estes' tax bill. Plaintiff Seay has not redeemed his property and has not been paid any

county treasury, and it may be paid therefrom to such owner, agent or representative in the same manner as to the excess arising from the sale of personal property sold for taxes is paid. If such excess is not called for within three years after such sale by the person entitled to receive the same, upon the order of the county commission stating the case or cases in which such excess was paid, together with a description of the lands sold, when sold and the amount of such excess, the county treasurer shall place such excess of money to the credit of the general fund of the county and make a record on his books of the same, and such money shall thereafter be treated as part of the general fund of the county. At any time within 10 years after such excess has been passed to the credit of the general fund of the county, the county commission may on proof made by any person that he is the rightful owner of such excess of money order the payment thereof to such owner, his heir or legal representative, but if not so ordered and paid within such time, the same shall become the property of the county.

ALA. CODE §40-10-28 (2006).

3

of the excess funds received by Defendants on the sale of his property, nor have such funds been credited to Plaintiff Seay's tax bill.

According to the complaint, Plaintiffs were not notified that: (1) Defendants might accept any excess funds received at the tax sale of Plaintiffs' property; (2) Defendants would retain the funds unless and until Plaintiffs sought to recover them; (3) Defendants would retain any interest earned on the excess funds; or, (4) Plaintiffs would be required to pay 12% interest on the excess funds in order to redeem their property. Plaintiffs also assert that Defendants, as a matter of policy, required property owners to redeem their property after a tax sale in order to receive *any* excess funds resulting from the sale of the property, and that such a policy denied the property rights and due process rights of the property owners by taking and keeping monies that rightfully belonged to the property owners.

The current settlement class of Plaintiffs' previously filed claims asked this court to, *inter alia*: (1) declare that the Excess Funds Statute found in Alabama Code § 40-10-28 is void as unconstitutional; (2) award to named Plaintiffs and Class Members under 42 U.S.C. §1983 damages equal to the excess funds held by the County, plus statutory interest thereon; (3) award to Plaintiffs and Class members the costs of this matter, including a reasonable attorneys' fee; (4) issue a permanent injunction enjoining the Defendants from interpreting and/or applying the Excess Funds Statute in a manner to allow the acceptance of excess funds; (5) enjoin the Defendants from interpreting or applying the Excess Funds Statute or any attendant statutes as requiring redeeming property owners to pay interest on excess funds held by the County as a condition of redemption; and (6) enjoin the Defendants from interpreting or applying the Excess Funds Statute or any attendant

statutes as requiring redeeming property owners to indemnify them as a condition of redemption. (Doc. # 49).

### B.       Procedural History

Procedurally, this case has been through the proverbial ringer, including surviving Defendants' first Motion to Dismiss for lack of subject matter jurisdiction filed in April 2005 (Docs. # 4 & 12), upon which the court declined to rule until after the parties conducted some amount of informative discovery on the issue.  (Doc. # 42).  In the interim, the parties engaged in settlement discussions, and Plaintiffs amended the complaint on four occasions.  (Docs. # 30, 32, 35, & 49). On June 26, 2006, the court certified the Plaintiff class and, on July 11, 2006, it approved the Class Notice.  (Docs. # 58, 59, & 60).  The class definition was later amended on September 11, 2006 by the agreement of the parties.  (Doc. # 61).

On October 31, 2006, Plaintiffs filed a motion for summary judgment, which was followed by a motion for summary judgment filed by Defendants on November 1, 2006.  (Docs. # 63, 64, 65, 67, 68 & 69).  However, at the time of filing these motions, the parties informed the court that the motions were filed largely to facilitate settlement negotiations.  Therefore, following a telephone conference on November 3, 2006, the court ordered that the motions be held in abeyance while the parties conferred in good faith regarding the possibility of settlement.

After Plaintiffs published notice of the class action in *The Birmingham News* on November 14, 2006 (Doc. # 70), and the court had dismissed the summary judgment motions after receiving notice that the parties had settled the case (Doc. # 75), various intervenors emerged from the depths. First, on January 26, 2007, Pamela Phillips, Van Phillips, and Chase Lake Partners, L.P., each of whom were named plaintiffs in a different class action filed almost ten years ago in the Circuit Court

6

of Jefferson County, Alabama, *Maples v. Williams*, Case No. CV 98-05330 (Jefferson Co., Ala. Cir. Ct., Mar. 17, 2000), sought to intervene in the case and/or to reap the benefits of settlement (if approved). (Doc. # 74). At the time, both Plaintiffs and Defendants opposed this intervention, citing the late procedural hour and the fact that the proposed intervenors were specifically excluded from the class definition. (Docs. # 78 & 80).

On February 22, 2007, after conducting a hearing on the motion to intervene and on Plaintiff's Motion for Preliminary Approval of the Settlement Agreement (Doc. # 76) some two weeks earlier, the court preliminarily approved the settlement and simultaneously denied the motion to intervene on the grounds that the proposed intervenors were explicitly excluded from the class definition, were barred by their previous settlement agreement in the *Maples v. Williams* case, and in any event did not timely move to intervene. (Docs. # 83, 84 & 85). That same day, Defendants moved to consolidate two cases recently filed in this district—*Geter v. Jefferson County*, CV-07-BE-0334-S (N.D. Ala. Feb. 21, 2007) and *MNP Holdings, LLC v. Jefferson County*, CV-07-0259-S (N.D. Ala. Feb. 7, 2007)—with the instant case, *Winston*. Working quickly so as to keep the settlement timeline on track, the court held a hearing on the motion to consolidate and issued its opinion denying consolidation on March 14, 2007, finding that any potential benefits of consolidation (judicial and financial economy) did not outweigh the potential detriment, specifically undue delay and possible prejudice to the *Winston* settlement class given that the *Geter* and *MNP Holdings* cases were newly-filed while *Winston* was more advanced and on the verge of settlement. (Docs. # 91 & 92).

After appointing a class claims administrator (Doc. # 92) on March 29, 2007, the court received two new motions to intervene made by the plaintiffs in the *Geter* and *MNP Holdings* cases.

7

(Docs. # 94, 95, 96, 97, & 98).  The next day, faced with quickly-multiplying plaintiffs, Defendants

filed their Notice of Withdrawal of Consent to Settlement and Motion to Dissolve Preliminary

Approval of Settlement Agreement (Doc. # 100), to which Plaintiffs responded with a Motion to

Enforce Settlement (Doc. # 102), accompanied by a Motion to Strike (Doc. # 103).  The next day,

on April 4, 2007, the court held a hearing on all pending motions.  A flurry of briefing followed the

hearing, culminating in the primary motion the court considers today—Defendants' Renewed Motion

to Dismiss filed on April 10, 2007.  (Doc. # 112).  Rather anticlimactically, Plaintiff moved for final

approval of the settlement and an award of attorneys' fees, but the court was forced to continue its

consideration of final settlement approval in order to properly entertain Defendants' abrupt

jurisdictional challenge.[3]  (Doc. # 114).  While Defendant's Renewed Motion to Dismiss has been

---

[3]To say that Defendant's jurisdictional challenge was "abrupt" is an understatement.  As detailed above, the parties were on the eve of settlement approval when Defendants re-filed this motion.  Defendants were fully aware of the court's instruction that their jurisdictional arguments should be raised after enough discovery was conducted to illuminate the key issues.  In addition, discovery was largely completed by April 26, 2006, and apparently closed by October 31, 2006 and November 1, 2006, when Plaintiffs and Defendants, respectively, filed their motions for summary judgment.  Regardless, Defendants did not renew their jurisdictional challenges at that time, despite multiple opportunities to do so at hearings and telephone conferences.  Instead, Defendants waited until six months had passed to renew their motion.

Thus, the court fully understands that this motion is, perhaps in large part, motivated by Defendants' belief that the settlement became less favorable after too many tardy children tried to get their hands in the cookie jar, so to speak.  Defendants were fully supportive of the settlement up to, and until, such time as it became apparent that the various groups of claimants alleging defects with the Excess Funds Statute would neither be merged into the present action by this court (through intervention or consolidation), nor go away quietly.  When it became clear they would be unable to resolve all claims against them with one fell swoop, Defendants sought to avoid *any* resolution of the claims against them—something the court adamantly refused to let them do.

Nevertheless, a subject matter jurisdiction challenge may be asserted at any time in a proceeding, and indeed the court itself has a continuing duty to review its own jurisdiction.  *See* FED. R. CIV. P. 12(h)(3); *Malowney v. Fed. Collection Deposit Group*, 193 F.3d 1342, 1346 (11th Cir. 1999).  The court takes this responsibility seriously and thus has undertaken an analysis of subject

pending, the *MNP Holdings* plaintiffs have voluntarily dismissed their case in this district, specifically stating that the TIA bars their suit in federal court, and have re-filed in the Circuit Court of Jefferson County.[4]   (Doc. # 116 Ex. A). Additionally, the *Geter* plaintiffs did not contest the County's Motion to Remand,[5] which was granted on May 8, 2007, and the order remanding the case cited the TIA as its basis for remand. (*Geter v. Jefferson County*, CV-07-BE-0334-S (N.D. Ala. Feb. 21, 2007) (Doc. # 11, order dismissing case)).

## III.   DISCUSSION

Whether this court has subject matter jurisdiction over Plaintiffs' claims is a threshold matter, which the court must consider before ruling on any other pending motions in the case. *FW/PBS v. Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction."). Defendants assert that this court lacks jurisdiction to hear Plaintiffs' claims because the Tax Injunction Act, 28 U.S.C. § 1341 (2007), strips this court of jurisdiction to adjudicate challenges to a state or local tax collection system. Defendants further assert that, even if this suit is not barred by the TIA, principles of comity should restrain the court's

---

matter jurisdiction.

[4] Although voluntarily dismissing their independently filed case, the court notes that the *MNP Holdings* plaintiffs were inexplicably unwilling to dismiss their motion to intervene in this case. The court frowns on these inconsistent positions, although it understands these plaintiffs would like nothing more than to eat their cake and have it too. The same can be said of the *Geter* plaintiffs, who also refused to withdraw their motions pending in this case; although these plaintiffs did not *voluntarily* dismiss their independently filed case, their concession to remand demonstrates their willingness to argue for two inherently inconsistent positions in this court.

[5] The County removed the *Geter* case on February 21, 2007, only to then seek its remand to the Circuit Court of Jefferson County, Alabama, after the breakdown of the settlement proposal in this case. (*Geter v. Jefferson County*, CV-07-BE-0334-S (N.D. Ala. Feb. 21, 2007) (Doc. # 1 (Notice of Removal) & Doc. # 10 (Motion to Remand by County))).

exercise of jurisdiction in this case, given that Plaintiffs' claims request that the court interfere with the state's fiscal system.

As outlined below, the court agrees with Defendants, whose arguments were echoed by the defendants in *DeShazo v. Baldwin County, Ala.*, No. 06-0174-WS-C, 2006 WL 2091754 (S.D. Ala. July 25, 2006) and adopted by that court.  In *DeShazo*, the court held the Tax Injunction Act imposes a jurisdictional bar to a federal court hearing claims very similar to those asserted by Plaintiffs here. The court agrees and further finds, in any event, that principles of comity counsel against the court retaining this case.

### A.      Tax Injunction Act

The Tax Injunction Act states:  "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341 (2006).  The TIA, when it applies, deprives a federal court of subject matter jurisdiction.  *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982).  "Once a federal court determines that it is without subject matter jurisdiction, [it] is powerless to continue," and therefore, the court must always first be sure of its own jurisdiction whenever it is in doubt.  *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999).  The Eleventh Circuit has held that "the Tax Injunction Act will bar the exercise of federal jurisdiction if two conditions are met: (1) the relief requested by the plaintiff will 'enjoin, suspend, or restrain' a state tax assessment; and (2) the state affords the plaintiff a 'plain, speedy and efficient remedy.'"  *Williams v. City of Dothan*, 745 F.2d 1406, 1411 (11th Cir.1984) (internal citations omitted).

10

1.      **Analysis of the First *Williams* Factor**

The threshold issue under the TIA is whether the suit attempts to restrain the assessment, levy or collection of a tax as comprehended within the statute.[6]   Plaintiffs insist, without citing to any authority, that "[b]efore the TIA can become a bar to jurisdiction, the challenged 'charge' must be a 'tax.'"  (Doc. # 117 at 12).  Although, as discussed *infra* on page 15, the court finds that Plaintiffs read the TIA too narrowly, it will nonetheless consider Plaintiffs' argument that the excess funds, and more importantly, *the interest charged thereon*, are not "taxes."

The decision of whether a charge is a "tax" is "'guided by federal law . . . rather than . . . state tax labels.'"  *Antosh v. City of College Park*, 341 F. Supp. 2d 565, 568 (D. Md. 2004) (quoting *Folio v. City of Clarksburg, W.Va.*, 134 F.3d 1211, 1217 (4th Cir. 1998)) (additional internal quotation omitted).  According to the Fourth Circuit, "the general inquiry is to assess whether the charge is for revenue raising purposes, making it a 'tax,' or for regulatory or punitive purposes, making it a 'fee.'"  *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000).[7]

---

[6]"State taxation, for § 1341 purposes, includes local taxation."  *Hibbs v. Winn*, 542 U.S. 88, 100 n.1 (2004).

[7]Although the Eleventh Circuit has not adopted this analysis, it has indicated that, as in *Valero Terrestrial*, "[t]he question [is] whether the purpose of the [challenged law] is to raise revenue for the city or to regulate licensees."  *Miami Herald Publishing Co. v. City of Hallandale*, 734 F.2d 666, 670 (11th Cir. 1984).  As both parties have referred the court to the *Valero* analysis, the court will use this framework for determining the "tax" versus "fee" issue.  To be clear, however, the court repeats that it does not consider that issue pivotal to its ultimate conclusion discussed *infra* that, even if the excess funds and interest charged thereon do not constitute a "tax," they are undoubtedly part of the *collection scheme* for property taxes in Jefferson County, which also brings them within the purview of the TIA.

Typically, "the 'classic tax' is imposed by the legislature upon a large segment of society, and is spent to benefit the community at large." *Id.* At the opposite end of the spectrum, "[t]he 'classic fee' is imposed by an administrative agency upon only those persons, or entities, subject to its regulation for regulatory purposes, or to raise money placed in a special fund to defray the agency's regulation-related expenses." *Id.* (internal quotes omitted). Nonetheless, "most charges will not fall neatly into either extremity and the characteristics of the charge will tend to place it somewhere in the middle." *Id.* In such cases, "if the ultimate use of the revenue benefits the general public then the charge will qualify as a 'tax,' while if the benefits are more narrowly circumscribed then the charge will more likely qualify as a 'fee.'" *Id.*

"To aid this analysis, courts have developed a three-part test that looks to different factors: (1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge." *Id.* Importantly, Plaintiffs' arguments address the excess funds obtained from public sale, but *not* the interest charged redeeming landowners thereon. (Doc. # 117 at 13–15). With respect to the first *Valero* factor, Plaintiffs do not argue that the Alabama Legislature has not authorized the acceptance of excess funds or the charging of interest thereon in order to redeem. In fact, by enacting the Excess Funds Statute about which Plaintiffs complain, along with Ala. Code § 40-10-15 (addressing the sale of property for delinquent

12

property taxes and stating that such property must be sold to the "highest bidder for cash"),[8] it clearly

has done so.

Instead, Plaintiffs' challenge is that "the amount of excess funds is not set by the Legislature"

but rather, by the successful bidder.  (Doc. # 117 at 13).  This characteristic, Plaintiffs suggest,

deprives the excess funds "of the certainty and definiteness" of a tax.  (*Id.*).

The court is not persuaded by Plaintiffs' characterization.  As the *DeShazo* court noted:

> Plaintiffs offer[] no authority for the proposition that a tax for purposes of the TIA
> must manifest some threshold level of numerical certitude. Nor does the statute
> appear more indefinite than common taxing provisions.  The statute establishes a rate
> of exaction (12%) to be charged against a figure that is identified by type (excess
> funds) but not by amount, for the obvious reason that the amount depends on
> individualized circumstances.  In like fashion, an income tax statute provides a rate
> of exaction to be applied against a figure that is identified by type (taxable income)
> but not by amount, yet it could scarcely be argued that the legislature's ignorance of
> a taxpayer's taxable income renders such a scheme objectionably indefinite.

---

[8] ALA. CODE § 40-10-15 provides, in pertinent part:

How sale made; duties of judge of probate.

> Such sales shall be made in front of the door of the courthouse of the county
> at public outcry, *to the highest bidder for cash*, between the hours of 10:00 A.M. and
> 4:00 P.M., and shall continue from day to day until all the real estate embraced in the
> decree has been sold.  The judge of probate must attend such sales and make a record
> thereof in a book to be kept by him in his office for that purpose, in which he shall
> describe each parcel of real estate sold and state to whom sold, the price paid by the
> purchaser, the date of sale and, if no sale was effected, stating that fact, and the
> reason thereof, and also in separate columns the amounts, as taken from the book or
> docket in which the decrees are entered, of each kind of tax penalties and of the fees
> and costs in each case, and he must also enter in such docket, in each case, the land
> sold under the decree in that case, the purchaser thereof and the amount at which it
> was sold.

ALA. CODE § 40-10-15 (1975) (emphasis added).

13

*DeShazo v. Baldwin County, Ala.*, No. 06-0174-WS-C, 2006 WL 2091754, at *2 (S.D. Ala. July 25, 2006).  Plaintiffs protest that the *DeShazo* court erred in its findings cited above, in that the court's "analogy overlooks the 'obligation' aspect of a real tax [because] [t]here is no obligation that an excess be paid, much less in any certain amount."  (Doc. # 117 at 14).  To the contrary, the court finds that such excess, and the twelve percent interest thereon, *must* be repaid if the taxpayer wishes to redeem his property.  That the exact amount of such excess and any interest thereon, is not directly set by the County is of no moment—it becomes a set amount once the mechanism of sale (public auction to the highest bidder) has taken place.

That Plaintiffs may never be forced to redeem their property, and thus recover the funds and interest, does not change this analysis.  Plaintiffs are correct that they will never be forced to redeem their property; however, Plaintiffs are then in a forced position to either abandon their property (which may have been sold at a significantly lower amount than Plaintiff's investment in and/or the value of the property) or redeem their property and pay the excess funds and statutory interest.  Simply because Plaintiffs have a choice *not* to pay and instead forfeit their property to the County does not mean the excess funds and interest are not a "tax."  In fact, the County's scheme presents the taxpayer with the same dichotomous choice as many property taxes—either pay up (with interest as part of the payment) or forfeit your property—the difference in this case being that the forfeit may not be permanent as the County gives taxpayers a thirteen-year grace period and mechanism by which to reclaim their property even after a tax sale has taken place.  During this interim period, the interest becomes not only the additional tax, but also the price paid for the option of redemption, which will increase the longer that the taxpayer chooses to delay redemption.  Thus, despite Plaintiffs' distaste for the *DeShazo* court's analogy, the fact remains that the Alabama Legislature

14

authorized the Defendants' imposition and collection of any excess funds and interest thereon. Accordingly, the first *Valero* factor is satisfied.

Although Plaintiffs point to the deposition testimony of Gary Boyd ("Boyd"), who acted as the Tax Collector's representative in discovery, as "evidence" that excess funds should not be treated as taxes, the court is not inclined to adopt Boyd's opinion lock, stock, and barrel. Boyd admits that the portion of a tax sale that results in the tax payment and the portion that results in excess funds are "handled differently," that he has "no way of knowing" what the excess will be prior to the tax sale, that the excess is "over and above the tax," that both portions are put in "separate accounts," that the excess funds are "not a levied amount," and that the excess funds are "earmarked" as such. (Doc. # 117 at 11–12). Although the court will weigh Boyd's testimony properly along with other relevant evidence, it does not find Boyd's opinion to be compelling or determinative. At most, Boyd's testimony shows a separate accounting system for the excess fund portion and the delinquent tax portion of the proceeds of a tax sale, the permissibility of which no party challenges. However, what his testimony fails to discuss, and what this court finds to be of greater significance, *see infra*, is first, what role the Excess Funds Statute *and* the twelve percent interest charge play in Jefferson County's collection scheme for property taxes, and, second, whether or not the twelve percent interest itself is considered part of the tax.

With respect to the second *Valero* factor, Plaintiff posits that the excess funds provisions are not a tax because they do not affect a "large segment of the population." (*Id*. at 14). To the contrary, this court agrees with the *DeShazo* court that "all property owners . . . are subject to these provisions if they fail to pay their taxes and their property is disposed of at a tax sale." *DeShazo,* 2006 WL 2091754, at *3. Thus, "a penalty on landowners delinquent in payment of their *ad valorem* taxes

15

satisfies this factor because 'the penalty . . . is [potentially] applicable to all residents . . . who own property.'"  *Id.*  (quoting *Washington v. Heard, Linebarger*, 2002 WL 1000972, at *2 (E.D. La. 2002), *aff'd*, 338 F.3d 442 (5th Cir. 2003)); *see also Gray v. Owens*, 413 F. Supp. 2d 573 (D. Md. 2006) (finding that school impact fees assessed against housing developers were taxes); *Antosh v. City of College Park*, 341 F. Supp. 2d 565, 568 (D. Md. 2004) (finding that "fees" for trash collection imposed on single-family rental homes and apartment units were "taxes" for TIA purposes); *McLeod v. Columbia Co., Ga.*, 254 F. Supp. 2d 1340, 1346–47 (S.D. Ga. 2003) (finding the storm water service charge covered a wide variety of property owners, and, therefore, met the second *Valero* factor).

Finally, with respect to the third *Valero* factor, Plaintiff argues that the excess funds are not a tax because they do not benefit the general public given that they are segregated for years pending re-payment to the owner or purchaser, and that, moreover, none of the funds have ever actually been moved to the County's general fund for the benefit of the public.  (Doc. # 117 at 14–15).  Plaintiff's interpretation holds no water, however, when one considers that "this factor measures not intermediate but 'ultimate' use of the funds, *Valero Terrestrial v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000), and the ultimate disposition of excess funds when they remain with the government is into the 'general fund of the county.'  ALA. CODE § 40-10-28."  *DeShazo*, 2006 WL 2091754, at *3.   In the context of the "ultimate" use of the funds, there can be no doubt that these general funds are used to benefit the general public.

As noted earlier, even if this court were persuaded that the *Valero* factors weigh in favor of a finding that the excess funds and the interest thereon do not constitute a tax, it would still find that the TIA bars Plaintiffs' claims.  Plaintiffs challenge the collection and retention of excess funds and

interest thereon, which are part of the overall collection system for *ad valorem* property taxes in Jefferson County.  Such a challenge, if successful, would materially alter the County's collection system and, therefore, could "restrain the . . . collection of any tax."  28 U.S.C. § 1341 (2006).[9]

A tax sale is a mode of collecting taxes, and Plaintiffs' efforts to challenge the tax sale procedure represent restraints on the collection of a tax prohibited by the TIA.  *See, e.g.*, *Wright v. Pappas*, 256 F.3d 635, 637 (7th Cir. 2001) (an action to declare a tax sale illegal is "comfortably within the prohibition of the Tax Injunction Act").  Thus, by demanding that the acceptance of excess funds be prohibited and/or the interest thereon not charged, Plaintiffs' lawsuit directly challenges state tax sale procedures.  In so finding, the court agrees with the *DeShazo* court:

> Such challenges necessarily restrain the collection of ad valorem taxes in violation of [the] TIA.  The improper interference with state tax collection efforts that this lawsuit represents takes at least two forms: (1) it would remove an incentive for landowners to settle their tax debts before their land is sold; and (2) it would undermine the efficacy of tax sales by discouraging potential purchasers from bidding at them.

*DeShazo*, 2006 WL 2091754, at *3.[10]

---

[9]For example, a suit to dissolve a state tax lien is barred by the TIA because it interferes with the state's efforts to collect taxes.  *Dawson v. Childs*, 665 F.2d 705, 710 (5th Cir.1982).  Likewise, a suit to challenge a penalty on delinquent property taxes imposed to cover collection costs is barred by the TIA because the penalty "is inexorably tied to the tax collection itself."  *Washington v. Linebarger, Goggan, Blair, Pena & Sampson, LLP*, 338 F.3d 442, 444 (5th Cir. 2003).

[10]The court finds particularly noteworthy the *DeShazo* court's apt footnote:

> To protect government's exceedingly strong interest in financial stability in this context [recalcitrant taxpayers], we have long held that a State may employ various financial sanctions . . . in order to encourage taxpayers to make timely payments prior to resolution of any dispute over the validity of the tax assessment." *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco*, 496 U.S. 18, 37 (1990).  Delayed payment is restrained collection, *Wright v. Pappas*, 256 F.3d at 637, and an elimination of excess funds (by eliminating the basis for an interest charge) will predictably lead to an increase in delayed payments.

Plaintiffs contend that the Supreme Court has drastically narrowed the TIA's reach to "cases in which state taxpayers seek federal court orders enabling them to avoid paying state taxes." *Hibbs v. Winn*, 542 U.S. 88, 107 (2004).  However, that contention is simply not supported by a thorough review of the *Hibbs* opinion. Rather, the *Hibbs* Court, in reviewing a First Amendment challenge to an Arizona statute permitting tax credits for contributions supporting parochial schools, placed great importance on whether or not the suit is brought by the taxpayer or a third party, as well as how the state's revenue would be affected by the challenge. *Hibbs*, 542 U.S. at 104–08.  Accordingly, when the language that Plaintiffs have quoted is read in proper context, it is clear that the Court, in reviewing its previous decisions (which, the respondents in *Hibbs* asserted, prohibited *any* federal court involvement in state tax administration) noted: "[A]ll of them [the previous cases] fall within § 1341's undisputed compass: All involved plaintiffs who mounted federal litigation to avoid paying state taxes (or to gain a refund of such taxes).  Federal-court relief, therefore, would have operated to reduce the flow of state tax revenue." *Id.* at 106.

To the contrary in this case, Plaintiffs *are* the taxpayers, and they expressly seek to enjoin Defendants' application of the Excess Funds Statute, which not only is part of the County's collection system for *ad valorem* property taxes, but also often imposes a specific penalty (the twelve percent interest) on delinquent taxpayers (such as themselves).  Thus, the court expressly finds that, for the reasons set forth above, the flow of *ad valorem* tax revenue would be reduced or delayed should Plaintiffs' lawsuit succeed, removing this case from the scope of cases that *Hibbs* sought to exclude from the TIA's purview. *See Smith v. Ayotte*, 356 F. Supp. 2d 9, 13–15 (D.N.H. 2005) (citing *May Trucking Co. v. Dep't of Transp.*, 388 F.3d 1261, 1267 (9th Cir. 2004)); *see also Henderson v.*

*DeShazo*, 2006 WL 2091754, at *3 n.4.

*Stalder*, 407 F.3d 351, 359 (5th Cir. 2005) (finding that the quoted portion of *Hibbs* applies only when suit is brought by a third person rather than the taxpayer and a successful suit would affirmatively enrich government coffers).

### 2.     Analysis of the Second *Williams* Factor

In order for the TIA to bar Plaintiffs' suit, not only must the court conclude that the excess funds and the interest charged thereon upon redemption are a tax or an essential part of the revenue collection scheme, but it must also find that Plaintiffs have a "plain, speedy and efficient remedy under state law."  The Eleventh Circuit has established that "the touchstone for whether a taxpayer has a 'plain, speedy and efficient' remedy is whether she is entitled to a 'full hearing and judicial determination at which she may raise any and all constitutional objections to the tax.'"  *Amos v. Glynn County Bd. of Tax Assessors*, 347 F.3d 1249, 1255 (11th Cir. 2003) (quoting *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 514 (1981)).  The burden is on Plaintiffs to show the absence of such a remedy.  *Amos*, 347 F.3d at 1256.

Defendants allege, and the court agrees, that the Alabama Declaratory Judgment Act ("ADJA") provides  such a "plain, speedy and efficient remedy."  The ADJA empowers state courts to render "a declaration of rights, status or other legal relations" under a statute or ordinance.  ALA. CODE § 6-6-223.  As the *DeShazo* court noted, "[t]he Supreme Court and various courts of appeal have deemed similar statutes to provide an adequate remedy for purposes of the TIA."  *DeShazo v. Baldwin County, Ala.* No. 06-0174-WS-C, 2006 WL 2091754, at *4 (S.D. Ala. July 25, 2006).[11]

---

[11]*See Tully v. Griffin*, 429 U.S. 68, 75 (1976) (holding a plaintiff had an adequate state remedy because "the New York courts have consistently held that . . . an action for a declaratory judgment . . . may be used when the claim is that the tax is unconstitutional"); *Washington v. Linebarger, Goggan, Blair, Pena & Sampson, LLP*, 338 F.3d 442, 444–45 (5th Cir. 2003) (finding an adequate remedy order under Louisiana law); *Lawyer v. Hilton Head Public Serv. Dist. No. 1*, 220

Additionally, declaratory judgments are frequently employed to raise federal constitutional challenges to aspects of Alabama tax law,[12] and the Eleventh Circuit has recognized that the declaratory judgment procedure provides an adequate remedy under the TIA. *See Jefferson County v. Acker*, 137 F.3d 1314, 1318 (l1th Cir. 1998) (finding where the county argued that "the Alabama Declaratory Judgment Act . . . and the judges' ability to assert their constitutional objections to the tax as affirmative defenses . . . provide the necessary remedies," that it "agree[d] with Jefferson County's argument"), *rev'd on other grounds*, 527 U.S. 423 (1999); *accord Black v. Alabama*, 71 F. Supp. 2d 1200, 1204 (S.D. Ala. 1999); *Richards v. Jefferson County*, 789 F. Supp. 369, 372 (N.D. Ala. 1992); *Clean Harbors, Inc. v. Sizemore*, 1990 WL 169423 at *2–*4 (N.D. Ala. 1990).

In response, Plaintiffs claim that a state remedy like the one in this case is inadequate if it is "uncertain." (Doc. # 117 at 23–24). However, a state remedy is uncertain only when "there is such uncertainty concerning the . . . remedy as to make it speculative." *Hillsborough v. Cromwell*, 326 U.S. 620, 625 (1946). Explaining their ruling in *Hillsborough*, the Supreme Court noted that there "the taxpayer could not raise his constitutional challenge in the administrative proceedings, and appeal to the state courts was discretionary with those courts." *California v. Grace Brethren Church*,

_____

F .3d 298, 305 n.7 (4th Cir. 2000) (finding an adequate remedy under South Carolina law); *Folio v. City of Clarksburg*, 134 F.3d 1211, 1216 (4th Cir. 1998) (finding an adequate remedy under West Virginia law); *Burris v. City of Little Rock*, 941 F.2d 717, 721 (8th Cir. 1991) (finding an adequate remedy under Arkansas law); *Long Island Lighting Co. v. Town of Brookhaven*, 889 F.2d 428, 431 (2d Cir. 1989) (finding an adequate remedy under New York law); *Dawson v. Childs*, 665 F.2d 705, 710 (5th Cir. 1982)[](finding an adequate remedy under Texas law).

[12]*E.g.*, *Ala. Alcoholic Beverage Control Bd. v. Henri-Duval Winery, L.L.C.*, 890 So.2d 70, 77 (Ala. 2003) (excise tax scheme violated the Commerce Clause); *Jefferson County v. Richards*, 805 So.2d 690, 694, 705 (Ala. 2001) (occupational tax did not violate the Equal Protection Clause); *Melof v. James*, 735 So.2d 1172, 1181 (Ala. 1999) (retirement benefit exemption from income tax did not violate the Equal Protection Clause).

457 U.S. 393, 414 n.31 (1982).  In this case, the ADJA has been expressly sanctioned by both federal and Alabama state courts as an adequate vehicle through which to challenge Alabama tax law, including specifically bringing federal constitutional challenges to such laws.  *See Acker*, 137 F.3d at 1318; *Black*, 71 F. Supp. at 1204; *Richards*, 789 F. Supp. at 372; *Clean Harbors, Inc. v. Sizemore*, 1990 WL 169423 at *2–*4 (N.D. Ala. 1990); *see* n.9 *supra*.  Therefore, the court finds that Plaintiffs have not shown the requisite "uncertainty" concerning their ability to present their constitutional challenges before an Alabama court.

Finally, Plaintiffs allege that state law provides no adequate remedy because "Alabama does not have an equal protection clause in its Constitution."  (Doc. # 117 at 24).  Given that Alabama <u>does</u> provide a judicial forum for the resolution of the federal constitutional challenges that Plaintiffs raise, Plaintiffs' argument cuts no ice at all.  In sum, the court concludes that Plaintiffs have a "plain, speedy and efficient remedy" under Alabama law, both the *Williams* factors are thus satisfied, and, therefore, the TIA bars Plaintiffs' suit being heard in federal court.

### B.    Comity

Properly understood, comity is a prudential restraint on the exercise of jurisdiction.  Even if the TIA did not apply to this particular case, "[n]othing in [the] concept[] of comity limits its application to exactions that, standing alone, constitute a 'tax' under some technical definition of the term."  *DeShazo v. Baldwin County, Ala.*, No. 06-0174-WS-C, 2006 WL 2091754, at *5 (S.D. Ala. July 25, 2006).  Federal courts "have long recognized that principles of federalism and comity generally counsel that courts should adopt a hands-off approach with respect to state tax administration."  *Nat'l Private Truck Council, Inc. v. Okla. Tax Comm'n*, 515 U.S. 582, 586 (1995).  As the Supreme Court observed long ago, "[i]t is upon taxation that the several States chiefly rely

21

to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible." *Dows v. City of Chicago*, 78 U.S. 108, 110 (1870).  Therefore, it is not surprising that the Supreme Court has condemned federal interference with the states' "fiscal operations," not simply states' taxes, *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 298 (1943), and outlined "the necessity of federal-court respect for state taxing schemes," not just state taxes *per se*.  *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 102 (1981) ("[W]e hold that taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts."); *see also Ayers v. Polk County*, 697 F.2d 1375, 1376 (11th Cir.1983) (challenge to a tax sale) ("The overriding concern of *McNary* is respect for state revenue collection systems . . . .").

Thus, before the passage of the TIA, principles of equity counseled federal courts to abstain in cases involving state taxation out of concern for undue federal interference with the states' internal economies. *See, e.g.*, *Matthews v. Rodgers*, 284 U.S. 521, 525 (1932); *see also Boise Artesian Water Co. v. Boise City*, 213 U.S. 276, 282 (1909) ("An examination of the decisions of this court shows that a proper reluctance to interfere by prevention with the fiscal operations of the state governments has caused it to refrain from so doing in all cases where the Federal rights of the persons could otherwise be preserved unimpaired."); *McNary*, 454 U.S. at 109 (quoting *Boise Artesian Water Co.*, 213 U.S. at 282).  The TIA represents a congressional recognition and sanction of this prior practice, and this "comity principle" survived the enactment of the TIA in 1937.  *See, e.g.*, *Great Lakes Dredge & Dock Co.*, 319 U.S. 293 (extending the TIA jurisdictional bar to suits for declaratory relief); *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 470 (1976).  In fact, the

22

Supreme Court has recognized that principles of comity may bar federal interference in state tax administration even where the Tax Injunction Act does not. *McNary*, 454 U.S. at 107 n.4.

Applying these principles, the court notes—as it previously stated—that the County's receipt of excess funds at tax sales and the charging of interest thereon at redemption serve to encourage taxpayers to make timely payments and potential buyers to bid competitively at tax sales. Thus, the excess funds procedure is a system that the Alabama legislature has deemed necessary to the operation of the county-managed property tax system, and the excess funds procedure, along with the overarching tax sale system of which it is a part, undoubtedly constitute a "mode[] adopted to enforce the taxes levied" within a single "revenue collection system." Such a system is protected from federal interference by comity. *See McNary*, 454 U.S. at 114–116; *Wright*, 256 F.3d at 637–38.

Thus, Plaintiffs "must seek protection of their federal rights by state remedies, provided of course that those remedies are plain, adequate, and complete . . . ." *McNary*, 454 U.S. at 116. There is "no significant difference . . . between remedies which are 'plain, adequate, and complete,' as that phrase has been used in articulating the doctrine of equitable restraint, and those which are 'plain, speedy and efficient,' within the meaning of § 1341." *Id.* at 116 n.8. The court has already found (*see supra* Part I.A.2), and reiterates here, that such a state remedy exists.[13] Because the court finds this suit is also barred by principles of comity, the proper remedy is dismissal. *See Winicki v. Mallard*, 783 F.2d 1567, 1570–71 (11th Cir. 1986); *Ayers v. Polk County*, 697 F.2d 1375, 1376–77 (11th Cir. 1983); *Gibson v. Gains*, 2006 WL 858336 at *3 (11th Cir. 2006).

---

[13]As with the TIA, the burden is on Plaintiffs to establish the absence of an adequate remedy for purposes of comity. *Winicki v. Mallard*, 783 F.2d 1567, 1570 (l1th Cir. 1986); *Gibson v. Gains*, 2006 WL 858336, at *3 (11th Cir. 2006).

23

## IV.    CONCLUSION

For the reasons discussed above, the court concludes that Defendants' Renewed Motion to Dismiss is due to be granted.  (Doc. # 112).  Therefore, the remaining motions in this case will be dismissed as moot, and this case will be dismissed without prejudice.  The court will enter a separate order in accordance with this memorandum opinion.

**DONE** and **ORDERED** this ____25th_____ day of June, 2007.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

24